J-A18029-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1404 WDA 2021 |

Appeal from the Order Entered November 15, 2021
In the Court of Common Pleas of Allegheny County
Family Court at CP-02-AP-0000074-2021

BEFORE:  STABILE, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: AUGUST 22, 2022**

Appellant, C.W. (Mother), appeals from the order terminating her parental rights to her son, H.W. (Child).  Upon review, we affirm.

The trial court recounted the factual and procedural history as follows:

Child was born October [], 2019, to Mother and an unknown Father.  Transcript of Testimony ("T.T.") 77 at 22, 24-25; 78 at 8.  No one has acknowledged paternity to Child.  *Id.* at 6-11.  On October 28, 2019, CYF received a protective service report.  *Id.* at 14-15.  The referral was in reference to Mother actively using substances and because Mother and Child tested positive for methadone and methamphetamines at the time of [Child's] birth. *Id.* at 17-19.  Mother admitted to CYF that she was using methamphetamines two weeks prior to Child's birth and Mother represented to CYF that she was not in treatment at that time. T.T. 79 at 2; 9.

On November 13, 2019, CYF opened a case for services and referred Mother and Child to Homebuilders services, as Mother told CYF that she would reside with a friend upon discharge from the hospital.  *Id.* at 22-25.  Mother was also referred to POWER for a drug and alcohol evaluation.  T.T. 80 at 1-2.

POWER recommended intensive outpatient treatment for Mother. *Id.* at 20-21. Mother reported to CYF that she was actively in treatment with Jade Wellness ("Jade"), which was acceptable to POWER at that time. *Id.* at 22-23; T.T. 82 at 10-11.

On December 24, 2019, a CYF caseworker attempted to meet with Mother and Child. *Id.* at 17. Mother refused to meet with the caseworker, was non-compliant, and refused to provide her whereabouts to the caseworker. *Id.* at 18-21. The testimony described that the caseworker believed Mother was under the influence and erratic. *Id.* at 24. As a result, CYF obtained an Emergency Custody Agreement ("ECA") on that date. T.T. 83 at 1. A shelter hearing was held on December 26, 2019. *Id.* at 5. Child was removed from Mother and placed in the custody of CYF via an Auberle foster home. *Id.* at 8-13. At the January 22, 2020 adjudicatory hearing, Mother stipulated to the facts that gave rise to dependency. On or around May 13, 2020, Child was placed with [K.B.] ("Foster Mother"), a pre-adoptive foster home placement where he has remained. T.T. 84 at 4-12; 20-23; T.T. 133 at 2. Child has not returned to Mother's legal or physical custody since the adjudicatory hearing held on January 22, 2020. *Id.* at 19.

Mother struggled with housing throughout the course of CYF involvement in this matter. During the course of the dependency proceeding, Mother lived at various places to include the Blackburn Center, a domestic violence shelter, as well as with a man named Matthew Hubberly in Wilkins Township. T.T. 10 at 3-25; T.T. 41 at 11. Mother obtained an apartment in Youngwood, PA at the time of the TPR; however [she] never provided CYF with a copy of the lease. T.T. 115 at 23-25.

Mother also had additional involvement in the criminal justice system. T.T. 89 at 23-24. On July 17, 2020, while Mother was serving a sentence of probation for drug possession and operating a motor vehicle with a suspended license, she was observed operating a motor vehicle without valid inspection and emission stickers. Wilkins Township Police Officer David Bokaw executed a traffic stop and Mother attempted to leave the scene, T.T. 6 at 20-21, and provided a false name to the police. T.T. 7 at 1-15. Mother was searched and found to be in possession of methamphetamines. T.T. 8 at 1-2.

On October 20, 2020, [the] Monroeville Police Department responded to a welfare check of an individual and found Mother sitting on the side of William Penn Highway with two backpacks. T.T. 16 at 14-16; T.T. 21 at 23. During the course of the welfare check, it was determined that Mother had been recently involved in a suspected burglary. Mother's backpack was searched and she was found to be in possession of stolen property and methamphetamines. T.T. 18 at 2-7; T.T. 2011-15. The police had received approximately twenty calls to the Wilkins Township house where Mother had been staying for a variety of complaints and disturbances ranging from drug activity to animal law violations. T.T. 11 at 3-4. Mother was sentenced to probation during the Child's dependency proceedings and was determined to not be compliant with her probation. T.T. 91 at 19-24.

Mother had an extensive mental health history with hospitalizations. T.T. 92 at 3-4. Mother had a diagnosis of bi-polar depression, anxiety, polysubstance abuse disorder, and previously attempted suicide. *Id.* at 5-6. CYF required Mother to engage in services with an intensive treatment program other than Jade because they did not believe it was the appropriate level of care for Mother, as Mother continued to relapse. *Id.* at 4; 75. CYF offered services other than Jade but Mother rejected [the] services. *Id.* 21-23. Mother represented to CYF that she would work with Jade to find her own treatment provider to obtain additional treatment services, but did not provide proof of receiving any such mental health services. T.T. 93 at 3-7. Mother also complicated matters when on November 9, 2021, she revoked her consent to release treatment records from Jade to CYF. T.T. 98 at 2-4. The revocation caused CYF to be unable to verify any alleged treatment Mother may have undergone.

Mother had court-ordered reunification goals throughout the course of CYF's involvement and Child's dependency. T.T. 86 at 17. Mother's reunification goals were: substance abuse treatment; complete POWER referrals; undergo random drug screens; mental health treatment; maintain stable employment; secure stable housing and for Mother to maintain consistent, ongoing and meaningful contact with Child. *Id.* 86 at 18-25; T.T. 87 at 1-2; 15-22.

CYF filed its petition for termination of parental rights against Mother and unknown Father on April 27, 2021. T.T. 85 at 1-2. On November 12, 2021, when the [c]ourt conducted a TPR

hearing, the Child had been in CYF care for 22 (twenty-two) months. Child has never been returned to Mother's care throughout the lifetime of the case.

Trial Court Opinion, 4/7/22, at 6-11 (footnotes omitted).

The court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Mother timely appealed. Both Mother and the trial court have complied with Pa.R.A.P. 1925.

Mother presents three issues for our review:

I. Whether the Trial Court committed fatal error and/or abused its discretion in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that the parental rights of [Mother] should be terminated pursuant to 23 Pa C.S.A. § 2511 (a)(2), (a)(5), and (a)( 8)?

II. Whether the Trial Court erred and/or abused its discretion by finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that terminating the parental rights of [Mother] best meets the needs and welfare of the minor child pursuant to 23 Pa C.S.A. §2511(b)?

III. Whether [Mother] had ineffective assistance of counsel which resulted in the trial court erroneously terminating [Mother's] parental rights?

Mother's Brief at 5.

In considering Mother's issues,

our standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

- 4 -

> As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179,1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

CYF has the burden to prove by clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.*

### *Section 2511(a)*

With respect to grounds for termination under 23 Pa.C.S.A. § 2511(a), we need only agree "as to any one subsection in order to affirm the termination of parental rights." *In re A.S.*, 11 A.3d 473, 478 (Pa. Super. 2010). Instantly, we address the second subsection, which provides for termination when

repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Subsection 2511(a)(2) "emphasizes the child's present and future need for 'essential parental care, control or subsistence necessary for his physical or mental well-being.'" *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008). Grounds for termination under subsection (a)(2) are not limited to affirmative misconduct. *Id.* "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, h[er parental] rights may be forfeited." *Id.* at 83. The grounds for termination of parental rights under § 2511(a)(2) may include acts of refusal as well as incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). We have long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

In her first issue, Mother claims "most of the conditions that led to dependency have been remedied and the conditions that have not been remedied can be remedied in a reasonable period of time." Mother's Brief at 17. The record does not support Mother's claim. As Child's counsel states, "the record is replete with clear and convincing evidence of Mother's repeated

refusal to address the concerns that existed at the time the Child came into care." Child Advocate's Brief at 24-25.

Child came into CYF's care when he was two months old. He turned two years old shortly before the November 12, 2021 termination hearing. After considering the testimony and evidence, the trial court determined CYF

> clearly established Mother's failure to remedy the issues that caused [C]hild to be placed into care and Mother to be unable to provide essential care for Child. Given the fact that Child has been in care of CYF for 23 months, the [trial c]ourt justifiably concluded that Mother cannot or will not remedy the problems that have made her incapable of functioning as Child's parent.

Trial Court Opinion, 4/7/22, at 22.

The trial court noted Mother completed "only 11 of 29 drug screens scheduled … despite the testimony that family members offered to transport Mother, [but] she refused to get in the car and be transported." *Id.* at 14-15. The court stated it "was not persuaded by Mother's rationale for lack of appropriate drug and alcohol treatment," and "reject[ed] Mother's testimony that if given the opportunity to be compliant with the goals moving forward, that she would be." *Id.* at 15.

With regard to Mother's mental health, licensed psychologist Dr. Terry O'Hara testified to evaluating Mother, Child, K.B. (Foster Mother), and J.B. (Foster Father) in June and July, 2021. N.T., 11/12/21, at 25. The parties stipulated to Dr. O'Hara being an expert in forensic psychology. *Id.* After meeting with Mother, Dr. O'Hara prepared a report stating his opinion that

Mother's "insight and judgment were assessed as poor and her prognosis is poor." *Id.* at 29; *see also* CYF Exhibit 1. Dr. O'Hara testified:

> Foremost [Mother] has a pretty significant history of criminal activity, including [past] charges, and a variety of pending charges as well, and [a] pretty significant history of substance abuse as well.
>
> ***
>
> I think that there are a variety of vulnerabilities in one's presentation when there is poor insight and judgment. There is typically a lack of accountability and responsibility for one's circumstances, and as a result, it is difficult for one to really remedy the concerns in one's presentation.
>
> For example, according to the records from Clarion Hospital, there was a pretty significant presentation and suicide attempt, a history of suicide attempts by [Mother]. She seemed to minimize her experience at Clarion. From her account, she was on a low dosage of an anti-depressant medication and they were going to change her medication and that is why she was under supervision of a psychiatric facility which, in my experience, would not be a reasonable explanation for one to be psychiatrically hospitalized.
>
> There is typically a shortage of beds and one is not psychiatrically hospitalized unless there is serious imminent risk of harm to self or others.
>
> So with that example, there would be difficulties from my perspective when she is minimizing that historical hospitalization which is revelatory of poor coping skills, when there is not an accountability with respect to [] historical circumstances[. I expect] that there would be limitations in moving forward and recognizing the level of treatment one needs and a level of vigilance with respect to one's mental health.

N.T., 11/12/21, at 29-31.

Dr. O'Hara diagnosed Mother with numerous disorders related to "major depression, recurrent"; opiate use; stimulant/amphetamine use; alcohol use;

antisocial personality; bipolar; and "suicide lethality." *Id.* at 44-46. In addition, Dr. O'Hara "questioned [Mother's] accuracy as a historian." *Id.* at 33. He stated that his recommendations were "limited as [he] didn't have any way to corroborate what was going on." *Id.* 49. While Dr. O'Hara testified there "would be several advantages to allowing [Mother] more time to determine her capacity to care for [Child's] needs and welfare" **if Mother was progressing with mental health and substance abuse treatment**, he also opined that rehabilitation can be "a longer process" when multiple substances are involved. *Id.* at 66. Dr. O'Hara further observed the "advantages for [Child] being adopted" if Mother was not consistent in addressing her mental health and substance abuse issues. *Id.* at 51-52. He stated "it is much easier for a child to develop security and attachment when there is safety, security, stability and nurturance." *Id.* at 70.

CYF caseworker Lisa Ketter testified that Mother was on probation and had "not been compliant with probation." *Id.* at 91. Moreover, Mother was "minimally compliant with her mental health goal and her drug and alcohol goal." *Id.* at 94. According to Ms. Ketter, few days before the hearing, CYF received information that Mother "was involved with Jade Wellness." *Id.* at 98. "However, she revoked her release of information for the agency to continue to talk with that program as of that date, November 9, 2021." *Id.* Ms. Ketter testified that Mother,

> continued to show signs of relapse and she entered programs
> indicating relapse, her behavior was erratic, she was failing to

show for parent/child visitation even when it was -- and she was pretty good at the virtual visits, but she also missed those visits as well. She missed multiple medical and early intervention visits and all of that was of concern.

*Id.* at 100.

The trial court found "Caseworker Ketter credibly testified." Trial Court Opinion, 4/7/22, at 15. In contrast, the court "did not accept Mother's averments because she has had the opportunity for the 23 months that the Child has been in care and during that time her actions prove the opposite." *Id.* at 16; *see also In re S.C.*, 247 A.3d at 1105 (The court at termination may reject as untimely or disingenuous a parent's vow to follow through on necessary services where the parent failed to co-operate with the agency or take advantage of available services during dependency proceedings.).

As the record supports the trial court's credibility findings, we discern no error in its conclusion that termination was proper under Section 2511(a)(2). Mother's first issue does not merit relief.

## *Section 2511(b)*

In her second issue, Mother argues the record does not support termination under Section 2511(b), which requires that the trial court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Mother asserts the trial court abused its discretion given its "emphasis on [Mother's non-]compliance with her reunification goals, when the focus should be on the needs and

welfare of [Child] and the bond that he holds with [Mother]." Mother's Brief at 23. Mother's argument is unconvincing.

Under Section 2511, "the court must engage in a bifurcated process prior to terminating parental rights." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the focus is on the conduct of the parent pursuant to § 2511(a). *Id.* "Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* When the trial court considers a child's needs and welfare, the "extent of any [parental] bond analysis ... necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. 2008).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d at 483 (citations omitted).

Here, Child has been in the pre-adoptive home of Foster Parents since May 13, 2020. N.T., 11/12/21, at 84. Dr. O'Hara opined that Child was bonded with both Mother **and** Foster Parents. *Id.* at 74. Dr. O'Hara testified that Foster Parents "showed strong parenting skills. [Child's] comportment

- 11 -

towards his foster parents was very positive, and there [are] a lot of indications that the foster parents are providing him with safety, security and stability." ***Id.*** at 5. Dr. O'Hara explained:

> At [Child's] age at the time of the evaluation, 19 months, he is developing a sense of trust and starting to exhibit some autonomous behaviors as well. These developmental themes really suppose safety, security and stability, and without that backdrop, it is very difficult for children to make progress on those developmental themes.

***Id.***

CYF caseworker Lisa Ketter testified that termination would not be detrimental to Child, who was doing well in his placement with Foster Parents and "bonded with the entire family." ***Id.*** at 105.

Also, Foster Mother testified:

I want [Mother and Child] to maintain a relationship.

> I think that eventually [Child] would want a relationship with her, that is his mom, but it's not like he knows any different right now. He doesn't know when he is going to see her, he doesn't know the difference if there is a missed visit.

… I do want him to maintain a relationship with her. I want them to have a relationship.

> I mean, I can tell that he loves the interaction with her, you know. When they are together, I can definitely see that there is a bond, there is a fondness there, they like interacting, but again, I don't think he gets who she is[.]

***Id.*** at 153-54.

The trial court found Child's "primary bond is with" Foster Parents, who are Child's "main sources of love, comfort, and security." Trial Court Opinion,

4/7/22, at 27. The court further concluded Child, "will not suffer extreme and emotional consequences by severing the bond." **Id.** The court

> conducted an individualized bond-effect analysis in this case. Although Mother appeared to have a bond with the Child, this [c]ourt balanced any bond against Mother's inability to serve the needs of the child. This 25 month old child has been out of Mother's care for 23 months. This [c]ourt keeps "the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly."

Trial Court Opinion, 4/7/22, at 26 (citation omitted). Accordingly, the court emphasized that Child "deserves permanency," **id.** at 28, and acted within its discretion in finding termination to be in Child's best interests under Section 2511(b). **In re A.S., supra.**

### Counsel's Ineffectiveness

In her third and final argument, Mother asserts trial counsel was ineffective for failing to introduce into evidence "more documents . . . to verify her capacity to parent" Child. Mother's Brief at 24. Mother acknowledges trial counsel introduced evidence of Mother's "treatment at Geyser and Waddington," but claims counsel's failure to introduce "more documents" constituted ineffectiveness, and resulted in "her parental rights being terminated." **Id.**

Mother fails to identify or describe the documents, or otherwise explain how they would have impacted the outcome of the termination hearing. **B.S.G. v. D.M.C.**, 255 A.3d 528, 535 (Pa. Super. 2021) ("It is beyond cavil that where an appellate brief fails to provide any discussion of a claim with

- 13 -

citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." (citation and quotation marks omitted)); *see also* Pa.R.A.P. 2119(a). Thus, Mother's issue is waived.

Even if Mother had preserved this argument, we would conclude it is meritless. This Court has explained:

> The unique nature of parental termination cases has long been recognized by the Supreme Court of Pennsylvania. Thus, [in] *In re Adoption of R.I.*, 455 Pa. 29, 312 A.2d 601 (1973), the Supreme Court held that an indigent parent in a termination of parental rights case has a constitutional right to counsel. The right to counsel in parental termination cases is the right to effective assistance of counsel even though the case is civil in nature. However, this right is more limited than that in criminal cases, as claims of ineffective assistance of counsel must be raised on direct appeal. We then review the record as a whole to determine whether or not the parties received a "fundamentally fair" hearing; a finding that counsel was ineffective is made only if the parent demonstrates that counsel's ineffectiveness was "the cause of the decree of termination."

*In the Interest of J.T.*, 983 A.2d 771, 774-75 (Pa. Super. 2009) (some citations omitted). As set forth above, the evidence supports the trial court's termination of Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b). Mother received a fundamentally fair hearing. Accordingly, no relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/22/2022